# FEIST PUBLICATIONS, INC. *v.* RURAL TELEPHONE SERVICE CO., INC.

No. 89–1909.   Argued January 9, 1991—Decided March 27, 1991

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, MARSHALL, STEVENS, SCALIA, KENNEDY, and SOUTER, JJ., joined. BLACKMUN, J., concurred in the judgment.

*Kyler Knobbe* argued the cause and filed briefs for petitioner.

*James M. Caplinger, Jr.,* argued the cause and filed a brief for respondent.*

---

*Briefs of *amici curiae* urging reversal were filed for the Association of North American Directory Publishers et al. by *Theodore Case Whitehouse;* for the International Association of Cross Reference Directory Publishers

JUSTICE O'CONNOR delivered the opinion of the Court.

This case requires us to clarify the extent of copyright protection available to telephone directory white pages.

I

Rural Telephone Service Company, Inc., is a certified public utility that provides telephone service to several communities in northwest Kansas. It is subject to a state regulation that requires all telephone companies operating in Kansas to issue annually an updated telephone directory. Accordingly, as a condition of its monopoly franchise, Rural publishes a typical telephone directory, consisting of white pages and yellow pages. The white pages list in alphabetical order the names of Rural's subscribers, together with their towns and telephone numbers. The yellow pages list Rural's business subscribers alphabetically by category and feature classified advertisements of various sizes. Rural distributes its directory free of charge to its subscribers, but earns revenue by selling yellow pages advertisements.

Feist Publications, Inc., is a publishing company that specializes in area-wide telephone directories. Unlike a typical

by *Richard D. Grauer* and *Kathleen McCree Lewis;* and for the Third-Class Mail Association by *Ian D. Volner.*

Briefs of *amici curiae* urging affirmance were filed for Ameritech et al. by *Michael K. Kellogg, Charles Rothfeld, Douglas J. Kirk, Thomas P. Hester,* and *Harlan Sherwat;* for the Association of American Publishers, Inc., by *Robert G. Sugarman* and *R. Bruce Rich;* for GTE Corp. by *Kirk K. Van Tine, Richard M. Cahill,* and *Edward R. Sublett;* for the National Telephone Cooperative Association by *L. Marie Guillory* and *David Cosson;* for the United States Telephone Association by *Richard J. Rappaport* and *Keith P. Schoeneberger;* and for West Publishing Co. by *Vance K. Opperman* and *James E. Schatz.*

Briefs of *amici curiae* were filed for Bellsouth Corp. by *Anthony B. Askew, Robert E. Richards, Walter H. Alford,* and *Vincent L. Sgrosso;* for the Direct Marketing Association, Inc., by *Robert L. Sherman;* for Haines and Co., Inc., by *Jeremiah D. McAuliffe, Bernard A. Barken,* and *Eugene Gressman;* and for the Information Industry Association et al. by *Steven J. Metalitz* and *Angela Burnett.*

directory, which covers only a particular calling area, Feist's area-wide directories cover a much larger geographical range, reducing the need to call directory assistance or consult multiple directories. The Feist directory that is the subject of this litigation covers 11 different telephone service areas in 15 counties and contains 46,878 white pages listings—compared to Rural's approximately 7,700 listings. Like Rural's directory, Feist's is distributed free of charge and includes both white pages and yellow pages. Feist and Rural compete vigorously for yellow pages advertising.

As the sole provider of telephone service in its service area, Rural obtains subscriber information quite easily. Persons desiring telephone service must apply to Rural and provide their names and addresses; Rural then assigns them a telephone number. Feist is not a telephone company, let alone one with monopoly status, and therefore lacks independent access to any subscriber information. To obtain white pages listings for its area-wide directory, Feist approached each of the 11 telephone companies operating in northwest Kansas and offered to pay for the right to use its white pages listings.

Of the 11 telephone companies, only Rural refused to license its listings to Feist. Rural's refusal created a problem for Feist, as omitting these listings would have left a gaping hole in its area-wide directory, rendering it less attractive to potential yellow pages advertisers. In a decision subsequent to that which we review here, the District Court determined that this was precisely the reason Rural refused to license its listings. The refusal was motivated by an unlawful purpose "to extend its monopoly in telephone service to a monopoly in yellow pages advertising." *Rural Telephone Service Co.* v. *Feist Publications, Inc.*, 737 F. Supp. 610, 622 (Kan. 1990).

Unable to license Rural's white pages listings, Feist used them without Rural's consent. Feist began by removing several thousand listings that fell outside the geographic range of its area-wide directory, then hired personnel to investigate the 4,935 that remained. These employees veri-

fied the data reported by Rural and sought to obtain additional information. As a result, a typical Feist listing includes the individual's street address; most of Rural's listings do not. Notwithstanding these additions, however, 1,309 of the 46,878 listings in Feist's 1983 directory were identical to listings in Rural's 1982–1983 white pages. App. 54 (¶ 15–16), 57. Four of these were fictitious listings that Rural had inserted into its directory to detect copying.

Rural sued for copyright infringement in the District Court for the District of Kansas taking the position that Feist, in compiling its own directory, could not use the information contained in Rural's white pages. Rural asserted that Feist's employees were obliged to travel door-to-door or conduct a telephone survey to discover the same information for themselves. Feist responded that such efforts were economically impractical and, in any event, unnecessary because the information copied was beyond the scope of copyright protection. The District Court granted summary judgment to Rural, explaining that "[c]ourts have consistently held that telephone directories are copyrightable" and citing a string of lower court decisions. 663 F. Supp. 214, 218 (1987). In an unpublished opinion, the Court of Appeals for the Tenth Circuit affirmed "for substantially the reasons given by the district court." App. to Pet. for Cert. 4a, judgt. order reported at 916 F. 2d 718 (1990). We granted certiorari, 498 U. S. 808 (1990), to determine whether the copyright in Rural's directory protects the names, towns, and telephone numbers copied by Feist.

## II

### A

This case concerns the interaction of two well-established propositions. The first is that facts are not copyrightable; the other, that compilations of facts generally are. Each of these propositions possesses an impeccable pedigree. That there can be no valid copyright in facts is universally understood. The most fundamental axiom of copyright law is that

"[n]o author may copyright his ideas or the facts he narrates." *Harper & Row, Publishers, Inc.* v. *Nation Enterprises*, 471 U. S. 539, 556 (1985). Rural wisely concedes this point, noting in its brief that "[f]acts and discoveries, of course, are not themselves subject to copyright protection." Brief for Respondent 24. At the same time, however, it is beyond dispute that compilations of facts are within the subject matter of copyright. Compilations were expressly mentioned in the Copyright Act of 1909, and again in the Copyright Act of 1976.

There is an undeniable tension between these two propositions. Many compilations consist of nothing but raw data— *i. e.*, wholly factual information not accompanied by any original written expression. On what basis may one claim a copyright in such a work? Common sense tells us that 100 uncopyrightable facts do not magically change their status when gathered together in one place. Yet copyright law seems to contemplate that compilations that consist exclusively of facts are potentially within its scope.

The key to resolving the tension lies in understanding why facts are not copyrightable. The *sine qua non* of copyright is originality. To qualify for copyright protection, a work must be original to the author. See *Harper & Row, supra*, at 547–549. Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. 1 M. Nimmer & D. Nimmer, Copyright §§ 2.01[A], [B] (1990) (hereinafter Nimmer). To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, "no matter how crude, humble or obvious" it might be. *Id.*, § 1.08[C][1]. Originality does not signify novelty; a work may be original even though it closely resembles other works so long as the similarity is fortuitous, not the result of copying. To illus-

trate, assume that two poets, each ignorant of the other, compose identical poems. Neither work is novel, yet both are original and, hence, copyrightable. See *Sheldon* v. *Metro-Goldwyn Pictures Corp.*, 81 F. 2d 49, 54 (CA2 1936).

Originality is a constitutional requirement. The source of Congress' power to enact copyright laws is Article I, §8, cl. 8, of the Constitution, which authorizes Congress to "secur[e] for limited Times to Authors . . . the exclusive Right to their respective Writings." In two decisions from the late 19th century—*The Trade-Mark Cases*, 100 U. S. 82 (1879); and *Burrow-Giles Lithographic Co.* v. *Sarony*, 111 U. S. 53 (1884)—this Court defined the crucial terms "authors" and "writings." In so doing, the Court made it unmistakably clear that these terms presuppose a degree of originality.

In *The Trade-Mark Cases*, the Court addressed the constitutional scope of "writings." For a particular work to be classified "under the head of writings of authors," the Court determined, "originality is required." 100 U. S., at 94. The Court explained that originality requires independent creation plus a modicum of creativity: "[W]hile the word *writings* may be liberally construed, as it has been, to include original designs for engraving, prints, &c., it is only such as are *original*, and are founded in the creative powers of the mind. The writings which are to be protected are *the fruits of intellectual labor*, embodied in the form of books, prints, engravings, and the like." *Ibid.* (emphasis in original).

In *Burrow-Giles*, the Court distilled the same requirement from the Constitution's use of the word "authors." The Court defined "author," in a constitutional sense, to mean "he to whom anything owes its origin; originator; maker." 111 U. S., at 58 (internal quotation marks omitted). As in *The Trade-Mark Cases*, the Court emphasized the creative component of originality. It described copyright as being limited to "original intellectual conceptions of the author," 111 U. S., at 58, and stressed the importance of requiring an author who accuses another of infringement to prove "the exist-

ence of those facts of originality, of intellectual production, of thought, and conception." *Id.*, at 59–60.

The originality requirement articulated in *The Trade-Mark Cases* and *Burrow-Giles* remains the touchstone of copyright protection today. See *Goldstein* v. *California,* 412 U. S. 546, 561–562 (1973). It is the very "premise of copyright law." *Miller* v. *Universal City Studios, Inc.,* 650 F. 2d 1365, 1368 (CA5 1981). Leading scholars agree on this point. As one pair of commentators succinctly puts it: "The originality requirement is *constitutionally mandated* for all works." Patterson & Joyce, Monopolizing the Law: The Scope of Copyright Protection for Law Reports and Statutory Compilations, 36 UCLA L. Rev. 719, 763, n. 155 (1989) (emphasis in original) (hereinafter Patterson & Joyce). Accord, *id.,* at 759–760, and n. 140; Nimmer § 1.06[A] ("[O]riginality is a statutory as well as a constitutional requirement"); *id.,* § 1.08[C][1] ("[A] modicum of intellectual labor . . . clearly constitutes an essential constitutional element").

It is this bedrock principle of copyright that mandates the law's seemingly disparate treatment of facts and factual compilations. "No one may claim originality as to facts." *Id.,* § 2.11[A], p. 2–157. This is because facts do not owe their origin to an act of authorship. The distinction is one between creation and discovery: The first person to find and report a particular fact has not created the fact; he or she has merely discovered its existence. To borrow from *Burrow-Giles,* one who discovers a fact is not its "maker" or "originator." 111 U. S., at 58. "The discoverer merely finds and records." Nimmer § 2.03[E]. Census takers, for example, do not "create" the population figures that emerge from their efforts; in a sense, they copy these figures from the world around them. Denicola, Copyright in Collections of Facts: A Theory for the Protection of Nonfiction Literary Works, 81 Colum. L. Rev. 516, 525 (1981) (hereinafter Denicola). Census data therefore do not trigger copyright because these data are not "original" in the constitutional sense. Nimmer

§ 2.03[E]. The same is true of all facts — scientific, historical, biographical, and news of the day. "[T]hey may not be copyrighted and are part of the public domain available to every person." *Miller, supra,* at 1369.

Factual compilations, on the other hand, may possess the requisite originality. The compilation author typically chooses which facts to include, in what order to place them, and how to arrange the collected data so that they may be used effectively by readers. These choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original that Congress may protect such compilations through the copyright laws. Nimmer §§ 2.11[D], 3.03; Denicola 523, n. 38. Thus, even a directory that contains absolutely no protectible written expression, only facts, meets the constitutional minimum for copyright protection if it features an original selection or arrangement. See *Harper & Row,* 471 U. S., at 547. Accord, Nimmer § 3.03.

This protection is subject to an important limitation. The mere fact that a work is copyrighted does not mean that every element of the work may be protected. Originality remains the *sine qua non* of copyright; accordingly, copyright protection may extend only to those components of a work that are original to the author. Patterson & Joyce 800–802; Ginsburg, Creation and Commercial Value: Copyright Protection of Works of Information, 90 Colum. L. Rev. 1865, 1868, and n. 12 (1990) (hereinafter Ginsburg). Thus, if the compilation author clothes facts with an original collocation of words, he or she may be able to claim a copyright in this written expression. Others may copy the underlying facts from the publication, but not the precise words used to present them. In *Harper & Row,* for example, we explained that President Ford could not prevent others from copying bare historical facts from his autobiography, see 471 U. S., at 556–557, but that he could prevent others from copying his "subjective descriptions and portraits of public figures."

*Id.*, at 563. Where the compilation author adds no written expression but rather lets the facts speak for themselves, the expressive element is more elusive. The only conceivable expression is the manner in which the compiler has selected and arranged the facts. Thus, if the selection and arrangement are original, these elements of the work are eligible for copyright protection. See Patry, Copyright in Compilations of Facts (or Why the "White Pages" Are Not Copyrightable), 12 Com. & Law 37, 64 (Dec. 1990) (hereinafter Patry). No matter how original the format, however, the facts themselves do not become original through association. See Patterson & Joyce 776.

This inevitably means that the copyright in a factual compilation is thin. Notwithstanding a valid copyright, a subsequent compiler remains free to use the facts contained in another's publication to aid in preparing a competing work, so long as the competing work does not feature the same selection and arrangement. As one commentator explains it: "[N]o matter how much original authorship the work displays, the facts and ideas it exposes are free for the taking . . . . [T]he very same facts and ideas may be divorced from the context imposed by the author, and restated or reshuffled by second comers, even if the author was the first to discover the facts or to propose the ideas." Ginsburg 1868.

It may seem unfair that much of the fruit of the compiler's labor may be used by others without compensation. As Justice Brennan has correctly observed, however, this is not "some unforeseen byproduct of a statutory scheme." *Harper & Row*, 471 U. S., at 589 (dissenting opinion). It is, rather, "the essence of copyright," *ibid.*, and a constitutional requirement. The primary objective of copyright is not to reward the labor of authors, but "[t]o promote the Progress of Science and useful Arts." Art. I, § 8, cl. 8. Accord, *Twentieth Century Music Corp.* v. *Aiken*, 422 U. S. 151, 156 (1975). To this end, copyright assures authors the right to their orig-

inal expression, but encourages others to build freely upon the ideas and information conveyed by a work. *Harper & Row, supra,* at 556–557. This principle, known as the idea/expression or fact/expression dichotomy, applies to all works of authorship. As applied to a factual compilation, assuming the absence of original written expression, only the compiler's selection and arrangement may be protected; the raw facts may be copied at will. This result is neither unfair nor unfortunate. It is the means by which copyright advances the progress of science and art.

This Court has long recognized that the fact/expression dichotomy limits severely the scope of protection in fact-based works. More than a century ago, the Court observed: "The very object of publishing a book on science or the useful arts is to communicate to the world the useful knowledge which it contains. But this object would be frustrated if the knowledge could not be used without incurring the guilt of piracy of the book." *Baker* v. *Selden,* 101 U. S. 99, 103 (1880). We reiterated this point in *Harper & Row:*

> "[N]o author may copyright facts or ideas. The copyright is limited to those aspects of the work—termed 'expression'—that display the stamp of the author's originality.
>
> "[C]opyright does not prevent subsequent users from copying from a prior author's work those constituent elements that are not original—for example . . . facts, or materials in the public domain—as long as such use does not unfairly appropriate the author's original contributions." 471 U. S., at 547–548 (citation omitted).

This, then, resolves the doctrinal tension: Copyright treats facts and factual compilations in a wholly consistent manner. Facts, whether alone or as part of a compilation, are not original and therefore may not be copyrighted. A factual compilation is eligible for copyright if it features an original selection or arrangement of facts, but the copyright is limited to

the particular selection or arrangement. In no event may copyright extend to the facts themselves.

## B

As we have explained, originality is a constitutionally mandated prerequisite for copyright protection. The Court's decisions announcing this rule predate the Copyright Act of 1909, but ambiguous language in the 1909 Act caused some lower courts temporarily to lose sight of this requirement.

The 1909 Act embodied the originality requirement, but not as clearly as it might have. See Nimmer § 2.01. The subject matter of copyright was set out in §§ 3 and 4 of the Act. Section 4 stated that copyright was available to "all the writings of an author." 35 Stat. 1076. By using the words "writings" and "author"—the same words used in Article I, § 8, of the Constitution and defined by the Court in *The Trade-Mark Cases* and *Burrow-Giles*—the statute necessarily incorporated the originality requirement articulated in the Court's decisions. It did so implicitly, however, thereby leaving room for error.

Section 3 was similarly ambiguous. It stated that the copyright in a work protected only "the copyrightable component parts of the work." It thus stated an important copyright principle, but failed to identify the specific characteristic—originality—that determined which component parts of a work were copyrightable and which were not.

Most courts construed the 1909 Act correctly, notwithstanding the less-than-perfect statutory language. They understood from this Court's decisions that there could be no copyright without originality. See Patterson & Joyce 760–761. As explained in the Nimmer treatise: "The 1909 Act neither defined originality, nor even expressly required that a work be 'original' in order to command protection. However, the courts uniformly inferred the requirement from the fact that copyright protection may only be claimed by 'authors' . . . . It was reasoned that since an author is 'the . . .

creator, originator' it follows that a work is not the product of an author unless the work is original." Nimmer § 2.01 (footnotes omitted) (citing cases).

But some courts misunderstood the statute. See, *e. g.*, *Leon* v. *Pacific Telephone & Telegraph Co.*, 91 F. 2d 484 (CA9 1937); *Jeweler's Circular Publishing Co.* v. *Keystone Publishing Co.*, 281 F. 83 (CA2 1922). These courts ignored §§ 3 and 4, focusing their attention instead on § 5 of the Act. Section 5, however, was purely technical in nature: It provided that a person seeking to register a work should indicate on the application the type of work, and it listed 14 categories under which the work might fall. One of these categories was "[b]ooks, including composite and cyclopædic works, directories, gazetteers, and other compilations." § 5(a). Section 5 did not purport to say that all compilations were automatically copyrightable. Indeed, it expressly disclaimed any such function, pointing out that "the subject-matter of copyright [i]s defined in section four." Nevertheless, the fact that factual compilations were mentioned specifically in § 5 led some courts to infer erroneously that directories and the like were copyrightable *per se*, "without any further or precise showing of original—personal—authorship." Ginsburg 1895.

Making matters worse, these courts developed a new theory to justify the protection of factual compilations. Known alternatively as "sweat of the brow" or "industrious collection," the underlying notion was that copyright was a reward for the hard work that went into compiling facts. The classic formulation of the doctrine appeared in *Jeweler's Circular Publishing Co.*, 281 F., at 88:

> "The right to copyright a book upon which one has expended labor in its preparation does not depend upon whether the materials which he has collected consist or not of matters which are publici juris, or whether such materials show literary skill *or originality*, either in thought or in language, or anything more than industri-

ous collection. The man who goes through the streets of a town and puts down the names of each of the inhabitants, with their occupations and their street number, acquires material of which he is the author" (emphasis added).

The "sweat of the brow" doctrine had numerous flaws, the most glaring being that it extended copyright protection in a compilation beyond selection and arrangement—the compiler's original contributions—to the facts themselves. Under the doctrine, the only defense to infringement was independent creation. A subsequent compiler was "not entitled to take one word of information previously published," but rather had to "independently wor[k] out the matter for himself, so as to arrive at the same result from the same common sources of information." *Id.*, at 88–89 (internal quotation marks omitted). "Sweat of the brow" courts thereby eschewed the most fundamental axiom of copyright law—that no one may copyright facts or ideas. See *Miller* v. *Universal City Studios, Inc.*, 650 F. 2d, at 1372 (criticizing "sweat of the brow" courts because "ensur[ing] that later writers obtain the facts independently . . . is precisely the scope of protection given . . . copyrighted matter, and the law is clear that facts are not entitled to such protection").

Decisions of this Court applying the 1909 Act make clear that the statute did not permit the "sweat of the brow" approach. The best example is *International News Service* v. *Associated Press*, 248 U. S. 215 (1918). In that decision, the Court stated unambiguously that the 1909 Act conferred copyright protection only on those elements of a work that were original to the author. International News Service had conceded taking news reported by Associated Press and publishing it in its own newspapers. Recognizing that § 5 of the Act specifically mentioned "'periodicals, including newspapers,'" § 5(b), the Court acknowledged that news articles were copyrightable. *Id.*, at 234. It flatly rejected, however, the notion that the copyright in an article extended to

the factual information it contained: "[T]he news element—the information respecting current events contained in the literary production—is not the creation of the writer, but is a report of matters that ordinarily are *publici juris;* it is the history of the day." *Ibid.**

Without a doubt, the "sweat of the brow" doctrine flouted basic copyright principles. Throughout history, copyright law has "recognize[d] a greater need to disseminate factual works than works of fiction or fantasy." *Harper & Row,* 471 U. S., at 563. Accord, Gorman, Fact or Fancy: The Implications for Copyright, 29 J. Copyright Soc. 560, 563 (1982). But "sweat of the brow" courts took a contrary view; they handed out proprietary interests in facts and declared that authors are absolutely precluded from saving time and effort by relying upon the facts contained in prior works. In truth, "[i]t is just such wasted effort that the proscription against the copyright of ideas and facts . . . [is] designed to prevent." *Rosemont Enterprises, Inc.* v. *Random House, Inc.,* 366 F. 2d 303, 310 (CA2 1966), cert. denied, 385 U. S. 1009 (1967). "Protection for the fruits of such research . . . may in certain circumstances be available under a theory of unfair competition. But to accord copyright protection on this basis alone distorts basic copyright principles in that it creates a monopoly in public domain materials without the necessary justification of protecting and encouraging the creation of 'writings' by 'authors.'" Nimmer § 3.04, p. 3–23 (footnote omitted).

## C

"Sweat of the brow" decisions did not escape the attention of the Copyright Office. When Congress decided to overhaul the copyright statute and asked the Copyright Office to study existing problems, see *Mills Music, Inc.* v. *Snyder,* 469 U. S. 153, 159 (1985), the Copyright Office promptly rec-

---

*The Court ultimately rendered judgment for Associated Press on non-copyright grounds that are not relevant here. See 248 U. S., at 235, 241–242.

ommended that Congress clear up the confusion in the lower courts as to the basic standards of copyrightability. The Register of Copyrights explained in his first report to Congress that "originality" was a "basic requisit[e]" of copyright under the 1909 Act, but that "the absence of any reference to [originality] in the statute seems to have led to misconceptions as to what is copyrightable matter." Report of the Register of Copyrights on the General Revision of the U. S. Copyright Law, 87th Cong., 1st Sess., p. 9 (H. Judiciary Comm. Print 1961). The Register suggested making the originality requirement explicit. *Ibid.*

Congress took the Register's advice. In enacting the Copyright Act of 1976, Congress dropped the reference to "all the writings of an author" and replaced it with the phrase "original works of authorship." 17 U. S. C. § 102(a). In making explicit the originality requirement, Congress announced that it was merely clarifying existing law: "The two fundamental criteria of copyright protection [are] originality and fixation in tangible form . . . . The phrase 'original works of authorship,' which is purposely left undefined, is intended to incorporate without change *the standard of originality established by the courts under the present [1909] copyright statute.*" H. R. Rep. No. 94–1476, p. 51 (1976) (emphasis added) (hereinafter H. R. Rep.); S. Rep. No. 94–473, p. 50 (1975) (emphasis added) (hereinafter S. Rep.). This sentiment was echoed by the Copyright Office: "Our intention here is to maintain the *established standards* of originality . . . ." Supplementary Report of the Register of Copyrights on the General Revision of U. S. Copyright Law, 89th Cong., 1st Sess., pt. 6, p. 3 (H. Judiciary Comm. Print 1965) (emphasis added).

To ensure that the mistakes of the "sweat of the brow" courts would not be repeated, Congress took additional measures. For example, § 3 of the 1909 Act had stated that copyright protected only the "copyrightable component parts" of a work, but had not identified originality as the basis for distin-

guishing those component parts that were copyrightable from those that were not. The 1976 Act deleted this section and replaced it with § 102(b), which identifies specifically those elements of a work for which copyright is not available: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work." Section 102(b) is universally understood to prohibit any copyright in facts. *Harper & Row, supra,* at 547, 556. Accord, Nimmer § 2.03[E] (equating facts with "discoveries"). As with § 102(a), Congress emphasized that § 102(b) did not change the law, but merely clarified it: "Section 102(b) in no way enlarges or contracts the scope of copyright protection under the present law. Its purpose is to restate . . . that the basic dichotomy between expression and idea remains unchanged." H. R. Rep., at 57; S. Rep., at 54.

Congress took another step to minimize confusion by deleting the specific mention of "directories . . . and other compilations" in § 5 of the 1909 Act. As mentioned, this section had led some courts to conclude that directories were copyrightable *per se* and that every element of a directory was protected. In its place, Congress enacted two new provisions. First, to make clear that compilations were not copyrightable *per se,* Congress provided a definition of the term "compilation." Second, to make clear that the copyright in a compilation did not extend to the facts themselves, Congress enacted § 103.

The definition of "compilation" is found in § 101 of the 1976 Act. It defines a "compilation" in the copyright sense as "a work formed by the collection and assembling of preexisting materials or of data *that* are selected, coordinated, or arranged *in such a way that* the resulting work as a whole constitutes an original work of authorship" (emphasis added).

The purpose of the statutory definition is to emphasize that collections of facts are not copyrightable *per se*. It conveys this message through its tripartite structure, as emphasized above by the italics. The statute identifies three distinct elements and requires each to be met for a work to qualify as a copyrightable compilation: (1) the collection and assembly of pre-existing material, facts, or data; (2) the selection, coordination, or arrangement of those materials; and (3) the creation, by virtue of the particular selection, coordination, or arrangement, of an "original" work of authorship. "[T]his tripartite conjunctive structure is self-evident, and should be assumed to 'accurately express the legislative purpose.'" Patry 51, quoting *Mills Music*, 469 U. S., at 164.

At first glance, the first requirement does not seem to tell us much. It merely describes what one normally thinks of as a compilation—a collection of pre-existing material, facts, or data. What makes it significant is that it is not the *sole* requirement. It is not enough for copyright purposes that an author collects and assembles facts. To satisfy the statutory definition, the work must get over two additional hurdles. In this way, the plain language indicates that not every collection of facts receives copyright protection. Otherwise, there would be a period after "data."

The third requirement is also illuminating. It emphasizes that a compilation, like any other work, is copyrightable only if it satisfies the originality requirement ("an *original* work of authorship"). Although § 102 states plainly that the originality requirement applies to all works, the point was emphasized with regard to compilations to ensure that courts would not repeat the mistake of the "sweat of the brow" courts by concluding that fact-based works are treated differently and measured by some other standard. As Congress explained it, the goal was to "make plain that the criteria of copyrightable subject matter stated in section 102 apply with full force to works . . . containing preexisting material." H. R. Rep., at 57; S. Rep., at 55.

The key to the statutory definition is the second require-
ment. It instructs courts that, in determining whether a
fact-based work is an original work of authorship, they
should focus on the manner in which the collected facts have
been selected, coordinated, and arranged. This is a straight-
forward application of the originality requirement. Facts
are never original, so the compilation author can claim origi-
nality, if at all, only in the way the facts are presented. To
that end, the statute dictates that the principal focus should
be on whether the selection, coordination, and arrangement
are sufficiently original to merit protection.

Not every selection, coordination, or arrangement will
pass muster. This is plain from the statute. It states that,
to merit protection, the facts must be selected, coordinated,
or arranged "in such a way" as to render the work as a whole
original. This implies that some "ways" will trigger copy-
right, but that others will not. See Patry 57, and n. 76.
Otherwise, the phrase "in such a way" is meaningless and
Congress should have defined "compilation" simply as "a
work formed by the collection and assembly of preexisting
materials or data that are selected, coordinated, or ar-
ranged." That Congress did not do so is dispositive. In ac-
cordance with "the established principle that a court should
give effect, if possible, to every clause and word of a statute,"
*Moskal* v. *United States*, 498 U. S. 103, 109–110 (1990) (in-
ternal quotation marks omitted), we conclude that the statute
envisions that there will be some fact-based works in which
the selection, coordination, and arrangement are not suffi-
ciently original to trigger copyright protection.

As discussed earlier, however, the originality requirement
is not particularly stringent. A compiler may settle upon a
selection or arrangement that others have used; novelty is
not required. Originality requires only that the author make
the selection or arrangement independently (*i. e.*, without
copying that selection or arrangement from another work),
and that it display some minimal level of creativity. Pre-

sumably, the vast majority of compilations will pass this test, but not all will. There remains a narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent. See generally *Bleistein* v. *Donaldson Lithographing Co.*, 188 U. S. 239, 251 (1903) (referring to "the narrowest and most obvious limits"). Such works are incapable of sustaining a valid copyright. Nimmer § 2.01[B].

Even if a work qualifies as a copyrightable compilation, it receives only limited protection. This is the point of § 103 of the Act. Section 103 explains that "[t]he subject matter of copyright . . . includes compilations," § 103(a), but that copyright protects only the author's original contributions—not the facts or information conveyed:

> "The copyright in a compilation . . . extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material." § 103(b).

As § 103 makes clear, copyright is not a tool by which a compilation author may keep others from using the facts or data he or she has collected. "The most important point here is one that is commonly misunderstood today: copyright . . . has no effect one way or the other on the copyright or public domain status of the preexisting material." H. R. Rep., at 57; S. Rep., at 55. The 1909 Act did not require, as "sweat of the brow" courts mistakenly assumed, that each subsequent compiler must start from scratch and is precluded from relying on research undertaken by another. See, *e. g., Jeweler's Circular Publishing Co.*, 281 F., at 88–89. Rather, the facts contained in existing works may be freely copied because copyright protects only the elements that owe their origin to the compiler—the selection, coordination, and arrangement of facts.

In summary, the 1976 revisions to the Copyright Act leave no doubt that originality, not "sweat of the brow," is the

touchstone of copyright protection in directories and other fact-based works. Nor is there any doubt that the same was true under the 1909 Act. The 1976 revisions were a direct response to the Copyright Office's concern that many lower courts had misconstrued this basic principle, and Congress emphasized repeatedly that the purpose of the revisions was to clarify, not change, existing law. The revisions explain with painstaking clarity that copyright requires originality, § 102(a); that facts are never original, § 102(b); that the copyright in a compilation does not extend to the facts it contains, § 103(b); and that a compilation is copyrightable only to the extent that it features an original selection, coordination, or arrangement, § 101.

The 1976 revisions have proven largely successful in steering courts in the right direction. A good example is *Miller* v. *Universal City Studios, Inc.*, 650 F. 2d, at 1369–1370: "A copyright in a directory . . . is properly viewed as resting on the originality of the selection and arrangement of the factual material, rather than on the industriousness of the efforts to develop the information. Copyright protection does not extend to the facts themselves, and the mere use of information contained in a directory without a substantial copying of the format does not constitute infringement" (citation omitted). Additionally, the Second Circuit, which almost 70 years ago issued the classic formulation of the "sweat of the brow" doctrine in *Jeweler's Circular Publishing Co.*, has now fully repudiated the reasoning of that decision. See, *e. g.*, *Financial Information, Inc.* v. *Moody's Investors Service, Inc.*, 808 F. 2d 204, 207 (CA2 1986), cert. denied, 484 U. S. 820 (1987); *Financial Information, Inc.* v. *Moody's Investors Service, Inc.*, 751 F. 2d 501, 510 (CA2 1984) (Newman, J., concurring); *Hoehling* v. *Universal City Studios, Inc.*, 618 F. 2d 972, 979 (CA2 1980). Even those scholars who believe that "industrious collection" should be rewarded seem to recognize that this is beyond the scope of existing copyright law. See Denicola 516 ("[T]he very vocabulary of copyright is ill

suited to analyzing property rights in works of nonfiction");
*id.*, at 520–521, 525; Ginsburg 1867, 1870.

### III

There is no doubt that Feist took from the white pages of
Rural's directory a substantial amount of factual information.
At a minimum, Feist copied the names, towns, and telephone
numbers of 1,309 of Rural's subscribers. Not all copying,
however, is copyright infringement. To establish infringe-
ment, two elements must be proven: (1) ownership of a valid
copyright, and (2) copying of constituent elements of the
work that are original. See *Harper & Row*, 471 U. S., at
548. The first element is not at issue here; Feist appears to
concede that Rural's directory, considered as a whole, is sub-
ject to a valid copyright because it contains some foreword
text, as well as original material in its yellow pages ad-
vertisements. See Brief for Petitioner 18; Pet. for Cert. 9.

The question is whether Rural has proved the second ele-
ment. In other words, did Feist, by taking 1,309 names,
towns, and telephone numbers from Rural's white pages,
copy anything that was "original" to Rural? Certainly, the
raw data does not satisfy the originality requirement. Rural
may have been the first to discover and report the names,
towns, and telephone numbers of its subscribers, but this
data does not "'ow[e] its origin'" to Rural. *Burrow-Giles*,
111 U. S., at 58. Rather, these bits of information are
uncopyrightable facts; they existed before Rural reported
them and would have continued to exist if Rural had never
published a telephone directory. The originality require-
ment "rule[s] out protecting . . . names, addresses, and tele-
phone numbers of which the plaintiff by no stretch of the
imagination could be called the author." Patterson & Joyce
776.

Rural essentially concedes the point by referring to the
names, towns, and telephone numbers as "preexisting mate-
rial." Brief for Respondent 17. Section 103(b) states ex-

plicitly that the copyright in a compilation does not extend to "the preexisting material employed in the work."

The question that remains is whether Rural selected, coordinated, or arranged these uncopyrightable facts in an original way. As mentioned, originality is not a stringent standard; it does not require that facts be presented in an innovative or surprising way. It is equally true, however, that the selection and arrangement of facts cannot be so mechanical or routine as to require no creativity whatsoever. The standard of originality is low, but it does exist. See Patterson & Joyce 760, n. 144 ("While this requirement is sometimes characterized as modest, or a low threshold, it is not without effect") (internal quotation marks omitted; citations omitted). As this Court has explained, the Constitution mandates some minimal degree of creativity, see *The Trade-Mark Cases*, 100 U. S., at 94; and an author who claims infringement must prove "the existence of . . . intellectual production, of thought, and conception." *Burrow-Giles, supra*, at 59–60.

The selection, coordination, and arrangement of Rural's white pages do not satisfy the minimum constitutional standards for copyright protection. As mentioned at the outset, Rural's white pages are entirely typical. Persons desiring telephone service in Rural's service area fill out an application and Rural issues them a telephone number. In preparing its white pages, Rural simply takes the data provided by its subscribers and lists it alphabetically by surname. The end product is a garden-variety white pages directory, devoid of even the slightest trace of creativity.

Rural's selection of listings could not be more obvious: It publishes the most basic information—name, town, and telephone number—about each person who applies to it for telephone service. This is "selection" of a sort, but it lacks the modicum of creativity necessary to transform mere selection into copyrightable expression. Rural expended sufficient ef-

fort to make the white pages directory useful, but insufficient creativity to make it original.

We note in passing that the selection featured in Rural's white pages may also fail the originality requirement for another reason. Feist points out that Rural did not truly "select" to publish the names and telephone numbers of its subscribers; rather, it was required to do so by the Kansas Corporation Commission as part of its monopoly franchise. See 737 F. Supp., at 612. Accordingly, one could plausibly conclude that this selection was dictated by state law, not by Rural.

Nor can Rural claim originality in its coordination and arrangement of facts. The white pages do nothing more than list Rural's subscribers in alphabetical order. This arrangement may, technically speaking, owe its origin to Rural; no one disputes that Rural undertook the task of alphabetizing the names itself. But there is nothing remotely creative about arranging names alphabetically in a white pages directory. It is an age-old practice, firmly rooted in tradition and so commonplace that it has come to be expected as a matter of course. See Brief for Information Industry Association et al. as *Amici Curiae* 10 (alphabetical arrangement "is universally observed in directories published by local exchange telephone companies"). It is not only unoriginal, it is practically inevitable. This time-honored tradition does not possess the minimal creative spark required by the Copyright Act and the Constitution.

We conclude that the names, towns, and telephone numbers copied by Feist were not original to Rural and therefore were not protected by the copyright in Rural's combined white and yellow pages directory. As a constitutional matter, copyright protects only those constituent elements of a work that possess more than a *de minimis* quantum of creativity. Rural's white pages, limited to basic subscriber information and arranged alphabetically, fall short of the mark. As a statutory matter, 17 U. S. C. § 101 does not afford pro-

tection from copying to a collection of facts that are selected, coordinated, and arranged in a way that utterly lacks originality. Given that some works must fail, we cannot imagine a more likely candidate. Indeed, were we to hold that Rural's white pages pass muster, it is hard to believe that any collection of facts could fail.

Because Rural's white pages lack the requisite originality, Feist's use of the listings cannot constitute infringement. This decision should not be construed as demeaning Rural's efforts in compiling its directory, but rather as making clear that copyright rewards originality, not effort. As this Court noted more than a century ago, "'great praise may be due to the plaintiffs for their industry and enterprise in publishing this paper, yet the law does not contemplate their being rewarded in this way.'" *Baker* v. *Selden*, 101 U. S., at 105.

The judgment of the Court of Appeals is

*Reversed.*

JUSTICE BLACKMUN concurs in the judgment.