**ABARCA HEALTH, LLC,**
**et al., Plaintiffs,**

v.

**PHARMPIX CORP., et al., Defendants.**

**Civil No. 11–1218(BJM).**

United States District Court,
D. Puerto Rico.

July 22, 2011.

Ana M. Rodriguez–Rivera, Carla Garcia–Benitez, Mauricio O. Muniz–Luciano, Vanessa Carballido–Clerch, O'Neill & Borges, San Juan, PR, for Plaintiffs.

Aileen Edme Vazquez–Jimenez, Jaime A. Lopez–Rodriguez, Samuel F. Pamias–Portalatin, Hoglund & Pamias, PSC, San Juan, PR, for Defendants.

### ORDER

BRUCE J. McGIVERIN, United States Magistrate Judge.

In this software copyright infringement action, plaintiffs Abarca Health LLC

("Abarca") and Pharmacy Insurance Corporation of America ("PICA") (collectively, "plaintiffs") requested the production of the entire source code of the allegedly infringing software sold by defendants PharmPix Corporation ("PharmPix"), Herminio José Correa–Garcés ("Correa"), Jaime Figueroa–Torres ("Figueroa"), Martty Martínez–Fraticelli ("Martínez"), Marcos González–Carballo ("González"), and their respective spouses and conjugal partnerships (collectively, "defendants"). (Docket No. 5). At the initial scheduling conference, the court ordered briefing on the parties' positions regarding plaintiffs' request (Docket No. 46), and the parties complied (Docket Nos. 57, 84) and replied in opposition to each other's briefs. (Docket Nos. 68, 71).[1] After careful consideration of the parties' arguments, plaintiffs' request for production of the entirety of defendants' source code is **denied** for the reasons stated below.

### FACTUAL BACKGROUND [2]

Plaintiffs are Puerto Rico corporations headquartered in San Juan. (Docket No. 1, ¶¶ 4, 6). Plaintiff PICA was organized in March 2005 by defendant Correa and two other individuals. (*Id.*, ¶ 13). The software at issue in this case, "Pharmacy Agent," is a Pharmacy Benefits Management ("PBM") application for processing Medicare Part D prescription drug claims. It was developed in-house for PICA under Correa's direct supervision. (Docket No. 1, ¶¶ 12, 13, 18, 24, 25). By 2006, PICA was marketing its PBM services to drug/health plan sponsors and seeking other prospective clients. (*Id.*, ¶ 35).

---

1. The court struck defendants' first attempt at filing a brief for failure to comply with the local rules. (Docket Nos. 58, 76). Plaintiffs' opposing brief (Docket No. 68) responds to this initial filing, not to defendants' subsequent, conforming brief. (Docket No. 84).

2. The court draws the pertinent facts from the allegations in the complaint. (Docket No. 1).

In April 2010, PICA'S PBM division was spun off into plaintiff Abarca, a separate legal entity, and PICA assigned to Abarca all of PICA'S PBM-related intellectual property ("IP") and associated rights and remedies, including the Pharmacy Agent software. (*Id.*, ¶¶ 42, 43, 44). Abarca owns the Copyright Office registrations for the 2006 and 2009 versions of Pharmacy Agent. (*Id.*, ¶¶ 5, 42; Docket No. 1–1).

Defendants Correa, Martínez, Figueroa, and González were officers and employees of PICA—Correa as Chief Information Officer ("CIO"), Martínez as Clinical Director, Figueroa as President and member of the Board of Directors, and González as software developer and, later, IT department team leader. Upon joining PICA, all four executed non-compete, confidentiality, and IP assignment agreements. (Docket No. 1, ¶¶ 5, 16, 17, 19, 22, 23, 26, 27, 28).

Martínez resigned from PICA by April 11, 2008. (*Id.*, ¶ 29). On August 29, 2008, while still PICA employees and members of its board, Correa and Figueroa, with the assistance of Iván López (who is not a party to this case), incorporated Pharmatica Benefits Management Corp. ("Pharmatica"), the alleged predecessor of defendant PharmPix. (*Id.*, ¶ 30). Correa notified his resignation to PICA in September 2008, but postponed its effective date until on or about April 4, 2009.[3] In the interim, he and López created a business plan for Pharmatica which identified Correa, Figueroa, and Martínez as Pharmatica's initial investors, and Correa applied for an issuer identification number ("IIN") for Pharmatica to be used in the processing of pharmacy claims transactions, with an anticipated date of first use of March 1, 2009. (*Id.*, ¶¶ 31–34). Figueroa resigned from PICA on March 27, 2009. (*Id.*, ¶ 36).

Defendant PharmPix was incorporated by López on April 7, 2009, with López, Correa, Figueroa, and Martínez as its founders. (*Id.*, ¶¶ 37, 39). Figueroa was allegedly PharmPix's first president until his replacement by current president Martínez. (*Id.*, ¶ 40). Defendant González resigned from PICA by June 26, 2009, and allegedly became a PharmPix employee soon afterward. (*Id.*, ¶ 42). Like Abarca (and its predecessor PICA), PharmPix promotes itself as a company offering PBM services to health plans and insurers including Medicare. (*Id.*, ¶¶ 38, 43).

In May 2010, during the open bidding process for a PBM services contract, Abarca's principals reviewed PharmPix's bid and noticed that PharmPix portrayed its "OneArk" system as an improved version of PICA'S PBM system. (*Id.*, ¶¶ 45, 46). Plaintiffs allege that PharmPix's software (hereafter "the Software") is an "essentially exact" copy, with minor modifications, of the copyrighted Pharmacy Agent software, but that defendants represent the Software as PharmPix's own "proprietary software application." (*Id.*, ¶¶ 48, 49, 50). Plaintiffs further allege that PharmPix unlawfully possesses and uses substantial amounts of PICA'S proprietary information. (*Id.*, ¶¶ 47, 51, 52).

## DISCUSSION

Plaintiffs brought the instant action in February 2011, alleging copyright infringement, unfair competition, misappropriation of trade secrets, and breach of contract and fiduciary duty. (*Id.*, ¶¶ 53–77). Pursuant to their copyright claim, they seek the disclosure of the entirety of the Software's source code (hereafter "the Source

---

**3.** Plaintiffs' complaint first states that Correa's last day was April 4, 2009, then later states that his last day was April 9, 2009. (*Id.*, ¶¶ 31, 37).

Code").[4] (Docket Nos. 5, 57, 68). Defendants oppose the request and move for a protective order staying production of the Source Code until plaintiffs provide more specific allegations regarding their copyright claim. (Docket Nos. 71, 84).

Federal Rule of Civil Procedure 26 ("Rule 26") provides, in relevant part,

> ... Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense.... For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence. All discovery is subject to the limitations imposed by Rule 26(b)(2)(C).

Fed.R.Civ.P. 26(b)(1). In turn, Rule 26(b)(2)(C) allows the court to limit the frequency or extent of the scope of discovery "[o]n motion or on its own" if the court determines that "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues." Fed.R.Civ.P. 26(b)(2)(C)(iii).

Protective orders supply another mechanism for limiting discovery. "A party or any person from whom discovery is sought may move for a protective order," which the court may issue for good cause in order "to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including ...:

(A) forbidding the disclosure or discovery ... [or] (G) requiring that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a specified way." Fed.R.Civ.P. 26(c)(1).

■ Defendants challenge both the relevance and the necessity of revealing the entire Source Code as evidence regarding plaintiffs' copyright claim. They argue that the Source Code is a trade secret whose production would burden defendants far more than it would benefit plaintiffs, since divulging it would have ruinous consequences for PharmPix. (Docket Nos. 84, p. 3–5). As defendants note, trade secret protection extends to source code. *See, e.g., Viacom Int'l Inc. v. YouTube Inc.,* 253 F.R.D. 256, 259–61 (S.D.N.Y. 2008) (denying plaintiffs' motion to compel disclosure of certain source codes which were "critical trade secret[s]" for defendants). Although plaintiffs apparently scoff at defendants' characterization of the Source Code as an important trade secret (Docket No. 68, p. 3–4), defendant Correa, PharmPix's CIO, has submitted an affidavit attesting to the "tremendous commercial value" of PharmPix's Source Code, which Correa states is "the heart of its business and most valuable asset," and describing the measures PharmPix has taken to protect the Source Code's confidentiality. (Docket No. 84–1). Accordingly, in order for plaintiffs' request to be granted, the entire Source Code must be relevant to plaintiffs' copyright claim and the benefits of disclosure must outweigh the considerable detriment invoked by defendants.

---

**4.** Software is typically written in "source code," a human-readable programming language, and then converted or compiled into "object code," a machine-readable version expressed in binary format. *Microsoft Corp. v. AT & T Corp.,* 550 U.S. 437, 459, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007) (Alito, J., concurring); *Computer Assoc. Int'l, Inc. v. Altai, Inc.,* 982 F.2d 693, 702 (2d Cir.1992) (source and object codes are "the literal elements of computer programs").

■ To establish copyright infringement, a plaintiff must prove (1) ownership of a valid copyright and (2) copying of constituent elements of the work that are original. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991); *Johnson v. Gordon*, 409 F.3d 12, 17 (1st Cir.2005) (quoting *Feist*). The plaintiff bears the burden of proof as to both elements. *Johnson*, 409 F.3d at 17 (citation omitted). The first element, ownership, is not implicated in the instant discovery request since it is defendants' work, not plaintiffs', that is the subject of the motion.

■ The second *Feist* element, copying, typically presents a more difficult question. "[I]t is important to note that copying does not invariably constitute copyright infringement." *Johnson*, 409 F.3d at 17–18 (citing *Feist*, 499 U.S. at 361, 111 S.Ct. 1282). Rather, the plaintiff must produce proof of *wrongful* copying, which "is a two-step process. First, the plaintiff must show that copying actually occurred. This showing entails proof that, as a factual matter, the defendant copied the plaintiff's copyrighted material." *Id.* at 18 (citing *Segrets, Inc. v. Gillman Knitwear Co.*, 207 F.3d 56, 60 (1st Cir.2000)). In the absence of direct evidence, the plaintiff may satisfy this first-step burden indirectly, "by adducing evidence that the alleged infringer enjoyed access to the copyrighted work and that a sufficient degree of similarity exists between the copyrighted work and the allegedly infringing work to give rise to an inference of actual copying." *Id.* (citing *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 813 (1st Cir.1995), *aff'd by an equally divided court*, 516 U.S. 233, 116 S.Ct. 804, 133 L.Ed.2d 610 (1996)).[5]

■ This degree of similarity is referred to as "probative similarity," which requires that the two works be "so similar that the court may infer that there was factual copying." *Id.* (citing *Lotus Dev.*, 49 F.3d at 813).[6] "The resemblances relied upon as abasis for finding probative similarity must refer to 'constituent elements of the [copyrighted] work that are original.'" *Id.* at 18–19 (quoting *Feist*, 499 U.S. at 361, 111 S.Ct. 1282). "Thus, in examining whether actual copying has occurred, a court must engage in dissection of the copyrighted work by separating its original, protected expressive elements from those aspects that are not copyrightable because they represent unprotected ideas or unoriginal expressions." *Id.* at 19 (citing *Concrete Mach. Co., Inc. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 608 (1st Cir.1988)).

■ After proving that copying actually occurred, then, under the second step of the wrongful-copying analysis, "the plaintiff must establish that the copying is actionable by proving that the copying of the copyrighted material was so extensive that it rendered the infringing and copyrighted works substantially similar," such that "the later work represented a wrongful appro-

---

5. Plaintiffs have alleged that the individual defendants, former officers and employees of PICA who went on to found PharmPix, had access to the Pharmacy Agent source code. The report by plaintiffs' expert, Philip Greenspun (hereafter "Greenspun Report"), states that defendant Gonzalez accessed the Pharmacy Agent source code. (Docket No. 69–1, p. 6). Plaintiffs do not apparently argue that defendants' Source Code would be probative of access, only of similarity.

6. "This requirement of probative similarity is somewhat akin to, but different than, the requirement of substantial similarity that emerges at the second step in the progression." *Johnson*, 409 F.3d at 18 (citing 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.03[A], at 13–33 (2004) [hereafter Nimmer]).

priation of expression." *Id.* at 18 (internal citations, quotation marks, and alteration omitted). The software context typically calls for expert testimony on substantial similarity, since the need for such testimony "may be greater in cases involving complex subject matters where an ordinary observer may find it difficult to properly evaluate the similarity of two works without the aid of expert testimony." *T–Peg, Inc. v. Vt. Timber Works, Inc.,* 459 F.3d 97, 116 (1st Cir.2006) (citations omitted). With regard to computer programs, the First Circuit has held that the test to be applied to determine substantial similarity differs depending on whether the alleged copying was literal—in the sense of verbatim—or not. *See Lotus Dev.,* 49 F.3d at 815.

▮▮ At the substantial-similarity step, as in the probative-similarity analysis, the originality requirement—"the *sine qua non* of copyright"—remains paramount. *Feist,* 499 U.S. at 348, 111 S.Ct. 1282 ("[t]he mere fact that a work is copyrighted does not mean that every element of the work may be protected"); *Johnson,* 409 F.3d at 19 (quoting *Feist* ). "While a finding of substantial similarity *vel non* derives from an examination of the juxtaposed works as a whole, that examination must focus on 'what aspects of the plaintiff's work are protectible under copyright laws and whether whatever copying took place appropriated those [protected] ele-

ments.' " *Johnson,* 409 F.3d at 19 (quoting *Matthews v. Freedman,* 157 F.3d 25, 27 (1st Cir.1998)). Thus, even if the court's substantial-similarity analysis yields "an overall impression of similarity," the requirement of originality is not satisfied "[i]f such an impression flows from similarities as to elements that are not themselves copyrightable." *Id.* (citing *Matthews,* 157 F.3d at 27; *Concrete Mach.,* 843 F.2d at 608–09). *See also* 4 Nimmer § 13.03[B][2][c], at 13–76 ("even admitted [verbatim] copying is not actionable when limited to unoriginal expression"), *quoted in Maddog Software, Inc. v. Sklader,* 382 F.Supp.2d 268, 277 (D.N.H.2005).

▮ Copyrighted software typically contains both copyrighted and unprotected or functional elements. *Sony Computer Entertainment, Inc. v. Connectix Corp.,* 203 F.3d 596, 599 (9th Cir.2000). The protectable elements of software include both "literal" and "non-literal" elements. The literal elements are the source code and object code; protectable non-literal elements include a program's "structure, sequence, organization, user interface, screen displays, and menu structures." *Gen. Universal Sys., Inc. v. Lee,* 379 F.3d 131, 142 (5th Cir.2004).[7]

▮ In short, the key to any software copyright infringement claim is the determination of whether a defendant copied protected elements of the allegedly infring-

---

**7.** While certain constituent elements (such as field names in database software) are generally not protected in and of themselves, they may be protectable as "compilations" if their selection, coordination, or arrangement results on the whole in an original work of authorship. 17 U.S.C. § 101; *Merchant Transaction Sys., Inc. v. Nelcela, Inc.,* 2009 WL 723001, at *8, *12–*13 (D.Ariz. Mar. 18, 2009) (citations and quotations omitted). Conversely, while only the expression of an idea, not the idea itself, is protectable, 17 U.S.C. § 102(b), even expression is not pro-

tected where there are effectively only very few ways or one way of expressing an idea (the so-called "merger doctrine"), or where "the expression embodied in the work necessarily flows from a commonplace idea" (the so-called "scènes-à-faire doctrine"). *Nelcela,* 2009 WL 723001, at *11 (citations and quotations omitted). The doctrines of merger and *scènes-à-faire* are of particular relevance in the software context, where technical constraints and industry standards may limit how a work is expressed. *See id.*

ed work that are original to the plaintiff—considering first the actual fact of copying, then the degree of such copying's extent, if any. Yet as defendants note (Docket Nos. 71, p. 5–7), plaintiffs have not specified what similarities exist between Pharmacy Agent's elements, literal and/or non-literal, and defendants' Software. Plaintiffs simply allege generally that defendants copied the entirety of Pharmacy Agent. Defendants cite Ninth Circuit case law that "plaintiff must identify the *source(s)* of the alleged similarity between [its] work and the defendant's work" before the court may determine the scope of copyright protection. *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1443 (9th Cir. 1994) (emphasis in original). Likewise, the Eleventh Circuit has opined,

> Perhaps the best approach for a district court in any computer program infringement case, whether involving literal or nonliteral elements, is for it to require the copyright owner to inform the court as to what aspects or elements of its computer program it considers to be protectable. This will serve as the starting point for the court's copyright infringement analysis.

*MiTek Holdings, Inc. v. Arce Eng'g Co., Inc.*, 89 F.3d 1548, 1555 (11th Cir.1996) (footnote omitted). While cases from other circuits are not binding on this court, I find them persuasive and consequently find plaintiffs' request for total Source Code disclosure too broad to grant at present, when plaintiffs have not told the court what is protectable about Pharmacy Agent.

The touchstone of any request for evidence is relevance. *See* Fed.R.Civ.P. 26(b)(1). In order to prevail on their claim, plaintiffs will have to demonstrate that defendant copied original, protected elements of Pharmacy Agent. They are not entitled to discovery of information that is irrelevant to their claim or unlikely to lead to the discovery of relevant information. To the extent that plaintiffs are claiming copyright in non-literal elements, the Source Code's relevance is questionable. As defendants astutely point out (Docket No. 84, p. 7), plaintiffs do not need the Source Code in order to adduce evidence of similarities between *non*-literal elements of the two works (such as a graphical user interface or menu structure). Thus, even if relevant, compelling disclosure of the Source Code as evidence of copying of non-literal elements would be unnecessary and would merely burden defendants without commensurate benefit.

That plaintiffs apparently claim defendants engaged in verbatim copying of a literal element of Pharmacy Agent, *i.e.*, the source code, does not obviate the need for restricting discovery of defendants' Source Code. In conducting the infringement analysis, the court will be called upon to determine the scope of copyright protection to which plaintiffs are entitled. A defendant cannot be held liable where the similarity between two works arises from uncopyrightable elements. *See Johnson*, 409 F.3d at 19; 4 Nimmer § 13.03[B][2][c], at 13–76 (verbatim copying of unoriginal expression is not actionable). That a work as a whole is copyrighted does not bring the unprotectable elements of the work within the scope of the copyright. *See, e.g., Maddog*, 382 F.Supp.2d at 280 (citation omitted); *O.P. Solutions, Inc. v. Intellectual Prop. Network, Ltd.*, 1999 WL 47191, at *5 (S.D.N.Y. Feb. 2, 1999) ("[I]t is not enough for the plaintiff to establish that the defendant copied all or some of the work in question; the plaintiff must also establish that the copying in question is unlawful." (citation omitted)).

Importantly, plaintiffs' own pleadings demonstrate that not all of Pharmacy

Agent is copyrightable original expression. The Greenspun Report states that similarities exist between a portion of Pharmacy Agent source code which Greenspun examined [8] and the portion of the Source Code which PharmPix deposited with its Copyright Office registration of the Software. (Docket No. 69–1, p. 6–12). In part, the similarities observed by Greenspun derive from a third-party program which both plaintiffs and defendants allegedly use in their respective applications, namely an XML schema called ConnectMate made by TC Software. (*Id.*, p. 9). PICA, Abarca's predecessor-in-interest, is a non-exclusive licensee of the ConnectMate program.[9]

A non-exclusive copyright licensee does not acquire a property interest in the licensed rights and lacks standing to sue for their infringement. *See In re Patient Educ. Media, Inc.,* 210 B.R. 237, 240 (Bkrcy.S.D.N.Y.1997) (citing *In re CFLC, Inc.,* 89 F.3d 673, 679 (9th Cir.1996); *Mac-Lean Assocs., Inc. v. William M. Mercer—Meidinger—Hansen, Inc.,* 952 F.2d 769, 778–79 (3d Cir.1991); *Effects Assocs., Inc. v. Cohen,* 908 F.2d 555, 558 (9th Cir.1990), *cert. denied,* 498 U.S. 1103, 111 S.Ct. 1003, 112 L.Ed.2d 1086 (1991); *Swarovski Am., Ltd. v. Silver Deer Ltd.,* 537 F.Supp. 1201, 1205 (D.Colo.1982); further citations omitted).

Accordingly, defendants cannot be held liable for any copying of ConnectMate, as that portion of Pharmacy Agent's source code is not original to plaintiffs. *See Maddog,* 382 F.Supp.2d at 280 ("Neither [de-fendant] nor anybody else can be held liable for infringement simply for using elements of [plaintiff's work] that were unoriginal to that program in the first instance."). Even if, as plaintiffs allege, defendants simply copied verbatim all of Pharmacy Agent's source code, the scope of plaintiffs' copyright in Pharmacy Agent does not include the ConnectMate portion (which, of course, has already been disclosed publicly through the Copyright Office deposit). And it follows that evidence of conduct for which plaintiffs lack standing to sue is of lesser necessity to the case than evidence corresponding to actionable conduct. *See* Fed.R.Civ.P. 26(b)(2)(C)(iii).

The fact that the Pharmacy Agent source code contains at least one third-party program only underscores the need for plaintiffs to identify the supposed similarities between the protectable elements of Pharmacy Agent and the Software. Absent greater specificity from plaintiffs, the court will be unable to determine what parts of Pharmacy Agent are copyrighted elements for which plaintiffs are entitled to protection. Plaintiffs argue (Docket No. 57, p. 4) that even unprotected elements of software have probative value, since they may illuminate the question of whether actual copying occurred. *See ClearOne Commc'ns, Inc. v. Chiang,* 2008 WL 2227556, at *2 (D.Utah May 28, 2008) (citing *Gates Rubber Co. v. Bando Chem. Indus., Ltd.,* 9 F.3d 823 (10th Cir.1993)). Yet this still presumes some delineation between what part of Pharmacy Agent is

---

**8.** The source code Greenspun examined is from the version of the software in existence at the time of the individual defendants' tenure at PICA. (Docket No. 69–1, p. 3).

**9.** The court takes judicial notice of the adjudicative fact that TC Software licenses its software non-exclusively to customers including PICA. *See* Fed.R.Evid. 201. TC Software's website lists PICA as a customer, along with several other organizations. TC Software—

Customers, http://www.objecttcs.com/Home/About/Customers.aspx (last visited July 20, 2011). "[I]t is not uncommon for courts to take judicial notice of factual information found on Internet websites." *Juniper Networks, Inc. v. Shipley,* 394 Fed.Appx. 713, at *1 (Fed.Cir.2010) (unpublished) (citing *O'Toole v. Northrop Grumman Corp.,* 499 F.3d 1218 (10th Cir.2007)).

protectable and what is not. Plaintiffs have yet to draw this line.

Plaintiffs also claim that demanding such specificity goes beyond what is required by law. (Docket No. 68, p. 5–8). They urge that the unsworn declaration of Scott Domínguez that PharmPix was using an "essentially exact copy" of Pharmacy Agent (Docket No. 1–2, ¶ 11) alone merits disclosure of the full Source Code. However, "[i]t is not sufficient for Plaintiff merely to allege that Defendant has copied its software" based on such a declaration. *See RGIS, LLC v. A.S.T., Inc.*, 2008 WL 186349, at *2 (E.D.Mich. Jan. 22, 2008) (appointing special master to compare parties' source codes) (citing *Lexmark Int'l. Inc. v. Static Control Components, Inc.*, 387 F.3d 522 (6th Cir.2004); *Kohus v. Mariol*, 328 F.3d 848, 857–58 (6th Cir. 2003)). Granted, the Domínguez declaration is not plaintiffs' only evidence. The Greenspun Report certainly shores up their allegations, but as discussed, it also undercuts their assertion that the whole Source Code is protectable.

■ Moreover, the court has broad and venerable discretion in the exercise of its case-management authority, particularly with regard to discovery. *Lamex Foods, Inc. v. Audeliz Lebrón Corp.*, 646 F.3d 100, 111–13 (1st Cir.2011); *In re Recticel Foam Corp.*, 859 F.2d 1000, 1006 (1st Cir.1988) ("Decisions regarding the scope of discovery, . . . and the protections to be afforded parties in the discovery process, are ordinarily left to the informed judgment of the district judge"). In the exercise of that authority, the court declines at this time to compel defendants to reveal their most valuable trade secret based on one unsworn declaration and an expert report premised in part on code plaintiffs did not write and do not own. In short, defendants have shown that good cause exists to deny plaintiffs' request for the production of the Source Code in its entirety *at this time*. Having as yet failed to flesh out their copyright claim, plaintiffs have not made a proper showing that the needs of the case merit the disclosure of an asset central to defendants' business.

In their briefs, the parties also argue about whether the Joint Confidentiality and Protective Order adopted by the court (Docket Nos. 52, 55) suffices as-is to cover the Source Code's disclosure. (Docket Nos. 57, 68, 71). In addition, plaintiffs argue that the source codes should be compared by the parties' respective experts, while defendants argue that this should be done by a special master subsequent to the deposition of Scott Domínguez. (Docket Nos. 57, 68, 84). These are questions for a later date. Plaintiffs must first allege just what parts of Pharmacy Agent are protectable and have been infringed before the court can competently craft discovery orders to investigate those allegations.

## CONCLUSION

For the reasons explained above, plaintiffs' request for production of the entirety of the Source Code (Docket No. 5) is **DENIED** without prejudice to any subsequent motion for production at a more appropriate time. Plaintiffs are hereby **ORDERED** to submit to defendants and the court by **August 12, 2011** a specific and comprehensive list of the elements of Pharmacy Agent, both literal and non-literal, which they contend are protectable and which have been infringed. Defendants' motion (Docket No. 84) is **GRANTED IN PART**; production and disclosure of the Source Code, as well as defendants' motion for the appointment of a special master and for an order compelling the deposition of Scott Domínguez, are **held in abeyance** pending the court's receipt of plaintiffs' motion in compliance, at which

time the court may order further briefing from the parties.

**IT IS SO ORDERED.**