# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

September 22, 2020

Lyle W. Cayce
Clerk

No. 19-30400
CONSOLIDATED WITH
No. 19-30889

PAUL BATISTE, *doing business as* ARTANG PUBLISHING, L.L.C.,

*Plaintiff—Appellant*,

*versus*

RYAN LEWIS, *also known as* MACKLEMORE LEWIS; BEN HAGGERTY, *also known as* MACKLEMORE, *also known as* MACKLEMORE AND RYAN LEWIS; MACKLEMORE PUBLISHING; RYAN LEWIS PUBLISHING; MACKLEMORE, L.L.C., *doing business as* MACKLEMORE PUBLISHING; ANDREW JOSLYN; ALLEN STONE; ANDREW JOSLYN MUSIC, L.L.C., *doing business as* DB JOSLYN MUSIC; STICKYSTONES PUBLISHING,

*Defendants—Appellees*.

Appeals from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:17-CV-4435

Before CLEMENT, SOUTHWICK, and HIGGINSON, *Circuit Judges*.

EDITH BROWN CLEMENT, *Circuit Judge*:

A local jazz musician, Paul Batiste, sued an internationally famous hip-hop duo for copyright infringement. He says the group digitally sampled his songs. Finding no evidence of copying, the district court granted summary

No. 19-30400
c/w No. 19-30889

judgment for the defendants and then ordered both Batiste and his attorney to pay the defendants' attorneys' fees. Batiste appealed. We lack jurisdiction to review the fee award against Batiste's attorney but otherwise AFFIRM the district court's judgments.

I.

Ben Haggerty, better known as "Macklemore," and Ryan Lewis form the world-famous hip-hop duo Macklemore & Ryan Lewis. The two released their first album, *The Heist*, in 2012, followed by *This Unruly Mess I've Made* a few years later. Their debut album was a tremendous success, earning the duo four Grammy Awards and producing two number-one hits on the *Billboard* Hot 100. The group's breakout single, "Thrift Shop," went on to reach diamond status, signifying more than ten million sales in the United States alone, and its music video has gained over 1.4 billion views on YouTube.

Macklemore and Lewis's rise to fame drew the attention of Paul Batiste, a self-proclaimed "legendary" jazz musician in New Orleans. Long before Macklemore met Lewis, Batiste was writing and recording his own original music. He distributed his music to local radio stations, disc jockeys, and record stores, and his band played at nightclubs in the area. Batiste doesn't have any Grammys, platinum records, or number-one hits, but he says some of the most popular recording artists have copied his music. Which brings us to this lawsuit.

Batiste sued Macklemore and Lewis for copyright infringement, claiming that the duo copied eleven of his songs. His allegations focus on the practice of "digital sampling," which involves copying sounds from an existing recording and incorporating them, with or without alteration, into a new one. *See VMG Salsoul, LLC v. Ciccone*, 824 F.3d 871, 875 (9th Cir. 2016). Batiste contends that the defendants sampled brief snippets of his

No. 19-30400
c/w No. 19-30889

copyrighted sound recordings in five of their songs: "Thrift Shop," "Can't Hold Us," "Same Love," "Neon Cathedral," and "Need to Know."[1]

At the close of discovery, the defendants moved for summary judgment. They also moved to exclude the report of Archie Milton, Batiste's expert musicologist, because Milton's deposition revealed that his report was ghost-written by Batiste. Indeed, when pressed, Milton admitted that Batiste conducted the analysis in the report and that he couldn't verify the accuracy of Batiste's work because he didn't have access to the computer software that Batiste used to assess whether sampling occurred. For these reasons, the district court excluded Milton's report.

After the district court threw out Milton's report, Batiste tried to sidestep the district court's order by resubmitting the report in his own name. To that end, he moved for leave to file a supplemental declaration in opposition to summary judgment. Batiste's supplemental declaration included the contents of Milton's excluded report, which he restyled as his own. Finding the restyled report both unreliable and untimely, the district court denied Batiste's motion. The court then granted summary judgment and dismissed Batiste's claims.

After prevailing on summary judgment, the defendants sought to recover some of their attorneys' fees from Batiste under the Copyright Act, 17 U.S.C. § 505. They also moved for sanctions against Batiste's attorney, DaShawn Hayes. The district court granted their motion, awarded them $125,427.81 in fees and costs, and held Batiste and Hayes jointly and severally

---

[1] Batiste says "Thrift Shop" samples his songs "Hip Jazz," "World of Blues," and "Kids"; "Can't Hold Us" samples his songs "Starlite Pt. 1" and "Love Horizon"; "Same Love" samples his songs "My Bad" and "Sportsman's Paradise"; "Neon Cathedral" samples his songs "Tone Palette," "Salsa 4 Elise (Fur Elise)," and "Drowning in My Blues"; and "Need to Know" samples his songs "Move That Body" and "Kids."

No. 19-30400
c/w No. 19-30889

liable for the award. Batiste separately appealed the summary judgment and fee award. We consolidated the two appeals.

## II.

In the first appeal, Batiste challenges the district court's decisions denying him leave to supplement his summary-judgment opposition with his restyled expert report and granting summary judgment for the defendants. Our review involves two levels of inquiry. "First, we review the district court's evidentiary rulings for abuse of discretion." *Ratliff v. Aransas County*, 948 F.3d 281, 286 (5th Cir. 2020). Then, with the record defined, we review the court's grant of summary judgment de novo. *Id.*

Summary judgment is proper when there's "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). We construe all facts and inferences in the light most favorable to the nonmovant, but the nonmovant can't defeat summary judgment with conclusory allegations, unsupported assertions, or only a scintilla of evidence. *Id.*

## A.

We begin by reviewing the district court's decision to deny Batiste's motion for leave to supplement his summary-judgment opposition with his restyled expert report. The district court denied Batiste's motion because Batiste didn't disclose himself as an expert witness or produce a report within the scheduling order's deadlines.

Rule 16(b) of the Federal Rules of Civil Procedure gives district courts broad discretion in enforcing the deadlines in their scheduling orders. *Geiserman v. MacDonald*, 893 F.2d 787, 790 (5th Cir. 1990). "We will not lightly disturb a court's enforcement of those deadlines." *Id.* at 792. Under

4

Rule 16(b)(4), a scheduling order may be changed only for "good cause." FED. R. CIV. P. 16(b)(4). In determining whether a district court's decision to exclude evidence as a means of enforcing its scheduling order was an abuse of discretion, we consider four factors: "(1) the explanation for the failure to timely [comply with the scheduling order]; (2) the importance of the [evidence]; (3) potential prejudice in allowing the [evidence]; and (4) the availability of a continuance to cure such prejudice." *Squyres v. Heico Cos.*, 782 F.3d 224, 237 (5th Cir. 2015) (first alteration in original) (quoting *Meaux Surface Prot., Inc. v. Fogleman*, 607 F.3d 161, 167 (5th Cir. 2010)).

Batiste doesn't even address, much less satisfy, Rule 16(b)(4)'s good-cause standard, and the four factors weigh against him. First, he offers no explanation for his failure to timely designate himself as an expert or submit the report in his own name. *See Shepherd ex rel. Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 287–88 (5th Cir. 2019) (affirming denial of leave to supplement report attached to summary-judgment opposition because the plaintiff offered no explanation for failing to include the supplemental materials with her original opposition). Second, even if Batiste's expert testimony was important to his case, the importance of that evidence "underscores the need for [Batiste] to have timely designated [himself as an] expert witness" and can't "singularly override" the district court's enforcement of its scheduling order. *Geiserman*, 893 F.2d at 792. Third, allowing Batiste to submit the report after the discovery deadline would have prejudiced the defendants, who would need to redepose Batiste about his qualifications and methodology. *See id.* at 791–92. Fourth, although the district court could have granted a continuance, reopened discovery, and allowed another round of pretrial motions, doing so would have disrupted the trial date, which was less than a month away. *See id.*

Ignoring Rule 16(b)(4), Batiste argues that it was an abuse of discretion for the district court to deny him leave to supplement his

opposition because courts should "freely" grant leave under Rule 15(a). *See* Fed. R. Civ. P. 15(a)(2). But Rule 15(a)'s lenient standard applies only to "pleadings." *See id.* The term "pleading" in Rule 15(a) "must be interpreted in conjunction with Rule 7(a), which enumerates the pleadings permitted in federal practice." *Albany Ins. Co. v. Almacenadora Somex, S.A.*, 5 F.3d 907, 910 (5th Cir. 1993) (quoting 6 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1475 (2d ed. 1990)). A declaration filed in opposition to a motion for summary judgment isn't a "pleading." *See id.* at 910–11. So Rule 15(a) doesn't apply.

Batiste didn't show good cause for changing the scheduling order to allow him to resubmit Milton's excluded expert report as his own. Thus, the district court acted well within its discretion in denying Batiste's motion for leave to supplement his summary-judgment opposition.

B.

Next, we turn to the district court's grant of summary judgment for the defendants. The court held that Batiste presented insufficient evidence to create a genuine dispute as to whether the defendants actually copied his music. We agree.

To prove copyright infringement, a plaintiff must show "ownership of a valid copyright" and "copying" by the defendant. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). "Copyright ownership is shown by proof of originality and copyrightability in the work as a whole and by compliance with applicable statutory formalities." *Eng'g Dynamics, Inc. v. Structural Software, Inc.*, 26 F.3d 1335, 1340 (5th Cir. 1994). One such statutory formality is registration. *See* 17 U.S.C. § 410(c). "A certificate of registration, if timely obtained, is prima facie evidence both that a copyright is valid and that the registrant owns the copyright." *Gen. Universal Sys., Inc.*

No. 19-30400
c/w No. 19-30889

*v. Lee*, 379 F.3d 131, 141 (5th Cir. 2004) (per curiam). Batiste's copyright ownership isn't challenged, at least not adequately,[2] so we focus on copying.

In this context, copying has two components: "factual" copying and "actionable" copying. *Id.* at 141–42, 157. The plaintiff must first establish factual copying, which requires proof that the defendant "actually used the copyrighted material to create his own work." *Id.* at 141 (quoting *Eng'g Dynamics*, 26 F.3d at 1340). Absent direct evidence of copying, which is hard to come by, a plaintiff can raise an inference of factual copying from "(1) proof that the defendant had access to the copyrighted work prior to creation of the infringing work and (2) probative similarity." *Positive Black Talk Inc. v. Cash Money Recs., Inc.*, 394 F.3d 357, 368 (5th Cir. 2004) (quoting *Peel & Co. v. Rug Mkt.*, 238 F.3d 391, 394 (5th Cir. 2001)), *abrogated on other grounds by Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154 (2010). A plaintiff can show probative similarity by pointing to "any similarities between the two works," even as to unprotectable elements, "that, in the normal course of events, would not be expected to arise independently." *Id.* at 370 & n.9.

A strong showing of probative similarity can make up for a lesser showing of access. *Id.* at 371. In fact, a plaintiff may raise an inference of factual copying without any proof of access if the works are "strikingly similar." *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 113 (5th Cir. 1978); *see also* 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 13.02[B] (rev. ed. 2020) [hereinafter Nimmer]. But the reverse is not true. Even with "overwhelming proof of access," a plaintiff

---

[2] The defendants contend, in a footnote, that Batiste hasn't produced registration certificates for all his works and that some of his certificates weren't timely obtained. "Arguments subordinated in a footnote are 'insufficiently addressed in the body of the brief,' and thus are waived." *Arbuckle Mountain Ranch of Tex., Inc. v. Chesapeake Energy Corp.*, 810 F.3d 335, 339 n.4 (5th Cir. 2016) (quoting *Bridas S.A.P.I.C. v. Gov't of Turkm.*, 345 F.3d 347, 356 n.7 (5th Cir. 2003)).

can't establish factual copying "without some showing of probative similarity." *Positive Black Talk*, 394 F.3d at 371 n.10.

"Not all copying, however, is copyright infringement." *Feist*, 499 U.S. at 361. If factual copying is proven, the plaintiff must then establish that the copying is legally actionable by showing "that the allegedly infringing work is substantially similar to protectable elements of the infringed work." *Lee*, 379 F.3d at 142. This usually requires a "side-by-side comparison" of the works' protectable elements "to determine whether a layman would view the two works as 'substantially similar.'" *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 550 (5th Cir. 2015) (quoting *Creations Unlimited, Inc. v. McCain*, 112 F.3d 814, 816 (5th Cir. 1997) (per curiam)). Substantiality is measured by considering "the qualitative and quantitative importance of the copied material to the plaintiff's work as a whole." *Id.* at 552 (citing *Positive Black Talk*, 394 F.3d at 373 n.12).

Altogether, a claim for copyright infringement has three elements: "(1) ownership of a valid copyright; (2) factual copying; and (3) substantial similarity." *Armour v. Knowles*, 512 F.3d 147, 152 (5th Cir. 2007) (per curiam). The district court homed in on the second element, factual copying. To survive summary judgment on that element, Batiste had to raise a genuine dispute as to either a combination of access and probative similarity or, absent proof of access, striking similarity. *See id.* at 152 & n.3. The district court held that Batiste failed to show that the defendants had access to his music or that their songs were strikingly similar to his. Batiste challenges those conclusions. He also argues that he need not show that the defendants' songs sound like his because any unauthorized sampling of a copyrighted sound recording is infringement. We address each issue in turn.

1.

To prove access, a plaintiff must show that "the person who created the allegedly infringing work had a reasonable opportunity to view [or hear] the copyrighted work." *Id.* at 152–53 (quoting *Peel*, 238 F.3d at 394). A "bare possibility" of access isn't enough, nor is a theory of access "based on speculation and conjecture." *Id.* at 153 (quoting *Peel*, 238 F.3d at 394–95). To withstand summary judgment, then, the plaintiff must present evidence that is "*significantly probative* of a *reasonable opportunity* for access." *Id.*

Batiste tries to prove access through "widespread dissemination" of his music and a "chain of events" linking his music to the defendants. Other courts have embraced these theories for proving access. *See, e.g.*, *Loomis v. Cornish*, 836 F.3d 991, 995 (9th Cir. 2016). We've never expressly adopted either one. *See Guzman v. Hacienda Recs. & Recording Studio, Inc.*, 808 F.3d 1031, 1037 n.5 (5th Cir. 2015). But we have found a work's widespread dissemination in a relevant market in which the defendant took part sufficient to show a "reasonable opportunity for access." *See Peel*, 238 F.3d at 395–97 (holding evidence that a rug wholesaler's copyrighted rug design "was widely disseminated among those involved in the United States rug trade" was sufficient to raise a triable issue on whether the wholesaler's competitor had a reasonable opportunity to view the design).

The evidence required to show widespread dissemination will vary, but courts typically consider "the degree of a work's commercial success and . . . its distribution through radio, television, and other relevant mediums." *Loomis*, 836 F.3d at 997. Simply put, the plaintiff must show that the work has enjoyed considerable success or publicity. *Compare ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 998 (2d Cir. 1983) (finding widespread dissemination from evidence that the plaintiff's song was the most popular song in the United States and among the top hits in England),

*and Cholvin v. B. & F. Music Co.*, 253 F.2d 102, 103–04 (7th Cir. 1958) (finding widespread dissemination from evidence that the plaintiffs sold more than 200,000 records and their song received nationwide airplay), *with Art Attacks Ink, LLC v. MGA Ent. Inc.*, 581 F.3d 1138, 1144 (9th Cir. 2009) (holding evidence that the plaintiff sold 2,000 t-shirts per year and displayed its design at county fairs and on the internet was insufficient to show widespread dissemination). For musical works, plaintiffs often prove widespread dissemination with evidence of frequent airplay, "record sales, awards, billboard charts, or royalty revenues." *Guzman*, 808 F.3d at 1038.

To support his widespread-dissemination theory, Batiste says that his music has been broadcast on local radio stations; sold in record stores, on his website, and at live shows; and digitally downloaded or streamed through online services such as iTunes, Spotify, and YouTube. But the evidence tells a different story. Although Batiste claims that his music was sold nationwide, the record shows meager sales in only a handful of local stores. And he admits that his downloads and streams—which didn't begin until 2013, after the defendants had released all but one of the allegedly infringing songs—have been "sparse." All in all, dissemination of Batiste's music was quite limited.

Batiste's chain-of-events theory fares no better. He claims that Macklemore and Lewis once performed in New Orleans at Siberia Bar, which is "not too far" from a record store that sold his music. Evidence that the defendants were near a store that sold Batiste's records creates only a "bare possibility" of access. *See Loomis*, 836 F.3d at 998 (holding evidence that the defendants spent ten days in Santa Barbara "when the local music scene was saturated" with the plaintiff's award-winning song was insufficient to show access); 4 NIMMER, *supra*, § 13.02[A] (explaining that "evidence showing that [the defendant] was present in a room with 15,000 records, including one containing the plaintiff's song" was insufficient to show access (citing *Palmieri v. Estefan*, 35 U.S.P.Q.2d 1382, 1383 (S.D.N.Y. 1995))).

Macklemore and Lewis might have spent a night in New Orleans in 2011, but they testified that they didn't visit any record stores in town. They also said that neither of them had heard of Batiste or listened to his music before this lawsuit. To find access on this theory, then, we would have to assume that the defendants were lying. Yet Batiste offered no evidence to dispute their testimony. *See Guzman*, 808 F.3d at 1039 n.9 ("Courts have rejected efforts by plaintiffs to establish access in the face of . . . sworn testimony [that the defendant has never heard of the plaintiff's work] unless there is probative evidence to the contrary." (quoting *Gal v. Viacom Int'l, Inc.*, 518 F. Supp. 2d 526, 539 (S.D.N.Y. 2007))).

Finally, Batiste argues that access can be inferred because the defendants have sampled other artists' recordings and the Pro Tools session used to create the allegedly infringing work "Thrift Shop" displays an error message that says "audio files are missing." From these facts, Batiste asks us to presume that among the "missing" files are samples of his recordings.

We won't jump to that conclusion. The defendants' sampling of other artists' recordings hardly proves that they had access to Batiste's works. *See Armour*, 512 F.3d at 154 n.15 (finding evidence that the defendant settled a copyright suit with a different artist was irrelevant). As for the Pro Tools message about missing files, Lewis testified that this is a "common message" that appears whenever files are moved across hard drives. It doesn't mean that those files are, in fact, missing. To infer access on this theory, we would have to make several "leaps of logic" on the basis of little more than "speculation and conjecture." *Id.* at 155. And that's something we can't do. *See Ferguson*, 584 F.2d at 113.

On the record before us, no reasonable jury could find more than a bare possibility that the defendants had an opportunity to hear and copy Batiste's music. Thus, Batiste failed to create a genuine dispute on access.

No. 19-30400
c/w No. 19-30889

2.

Without proof of access, Batiste's must show "striking similarity" between the defendants' songs and his. To meet that burden, he must point to "similarities . . . that can only be explained by copying, rather than by coincidence, independent creation, or prior common source.'" *Guzman*, 808 F.3d at 1039 (quoting *Selle v. Gibb*, 741 F.2d 896, 904 (7th Cir. 1984)).

Striking similarity isn't "merely a function of the number of identical notes" in two songs. *Id.* at 1040 (quoting *Selle*, 741 F.2d at 903). To be "striking," the similarities must "appear in a sufficiently unique or complex context." *Id.* at 1039 (quoting *Selle*, 741 F.2d at 904). Evidence of complexity or uniqueness is crucial in cases involving popular music, because most songs "are relatively short and tend to build on or repeat a basic theme." *Id.* (quoting *Benson v. Coca-Cola Co.*, 795 F.2d 973, 975 n.2 (11th Cir. 1986) (per curiam)). For example, even when two songs shared "virtually identical" sixteen-word openings and similar melodies, rhythmic patterns, lyrical themes, and instrumental accompaniment, we held that the songs weren't strikingly similar because "many other songs expressed the same phrases, attitudes, and expressions," and the similarities "were either common to the . . . genre or common in other songs." *Id.* at 1039–40.

Batiste doesn't even try to meet the striking-similarity standard. He argues instead that, considering his "overwhelming evidence of access," the district court erred by requiring him to show striking similarity. Given Batiste's refusal to offer any argument on striking similarity, either below or on appeal, this issue is forfeited. *See Adams v. Unione Mediterranea di Sicurta*, 364 F.3d 646, 653 (5th Cir. 2004). Even if Batiste had preserved this issue, though, he offered no admissible evidence of similarities aside from audio recordings of the songs themselves. After carefully listening to each of Batiste's songs and the defendants' song that allegedly infringes it, we

conclude that the songs "are in no way similar enough" for a reasonable jury to find striking similarity. *Armour*, 512 F.3d at 156 n.19. Because Batiste can't show access or striking similarity, he can't prove factual copying.

3.

Before moving on, we address Batiste's argument that his claims for infringement of his sound recordings are subject to a different analysis than those for infringement of his musical compositions. To establish infringement of his sound recordings, as opposed to their underlying compositions, Batiste contends that he need only show that the defendants sampled his songs—not that the songs "sound" similar.

True, sampling a recorded song implicates two distinct copyrights: one in the sound recording and one in the underlying composition. *See* 17 U.S.C. § 102(a)(2), (7); *VMG Salsoul*, 824 F.3d at 877. The copyright of a musical composition, which typically comprises sheet music and lyrics, "protects the generic sound that would necessarily result from any performance of the piece." *Newton v. Diamond*, 204 F. Supp. 2d 1244, 1249 (C.D. Cal. 2002), *aff'd*, 388 F.3d 1189 (9th Cir. 2004). By contrast, the copyright of a sound recording, which is the aggregation of sounds captured in a recording of a particular performance, protects "the elements unique to [that] performance," *Newton*, 388 F.3d at 1193—that is, "how the musicians *played* the notes," *VMG Salsoul*, 824 F.3d at 879. But this distinction makes no difference here.

Batiste relies on *Bridgeport Music, Inc. v. Dimension Films*, 410 F.3d 792 (6th Cir. 2005), which adopted a bright-line rule that any unauthorized sampling of a sound recording, no matter how trivial, is infringement. *Id.* at 800–01. The Sixth Circuit focused on 17 U.S.C. § 114(b), which states that the rights in a sound-recording copyright "do not extend to the making or duplication of another sound recording that consists *entirely* of an

independent fixation of other sounds, even though such sounds imitate or simulate those in the copyrighted sound recording." *Id.* at 800 (quoting 17 U.S.C. § 114(b)). In other words, § 114(b) "makes clear that statutory protection for sound recordings extends only to the particular sounds of which the recording consists" and won't prevent "imitation of a recorded performance," even if "one performer deliberately sets out to simulate another's performance as exactly as possible." H.R. REP. NO. 94-1476, at 106 (1976), *as reprinted in* 1976 U.S.C.C.A.N. 5659, 5721. Thus, an artist infringes a copyrighted sound recording by sampling "all or any substantial portion of the actual sounds" from that recording. *Id.*

Rather than interpret § 114(b) as a limitation on the copyright owner's rights, the Sixth Circuit found that it dispensed with the substantial-similarity element for infringement of sound recordings. *Bridgeport*, 410 F.3d at 800–01. Fixing on the word "entirely" in § 114(b), the court reasoned that if a new recording is exempt from liability when *no* sounds are sampled (i.e., the new recording "consists entirely of an independent fixation of other sounds"), then a new recording constitutes infringement if *any* sounds are sampled. *Id.*

*Bridgeport* has been widely criticized. *See, e.g.*, *VMG Salsoul*, 824 F.3d at 880–87 (disagreeing with *Bridgeport* and creating a circuit split); *Saregama India Ltd. v. Mosley*, 687 F. Supp. 2d 1325, 1341 (S.D. Fla. 2009) ("Section 114(b) does not seem to support the distinction between sound recordings and all other forms of copyrightable work that the *Bridgeport* court imposes."), *aff'd*, 635 F.3d 1284 (11th Cir. 2011); 4 NIMMER, *supra*, § 13.03[A][2][b] (explaining that *Bridgeport* "rests on a logical fallacy" and advising "courts not bound by that ruling" to consider whether "the sampled portions are substantially similar to plaintiff's work"). We need not decide whether to adopt *Bridgeport*'s rule here, however, because that rule doesn't relieve plaintiffs of proving factual copying.

No. 19-30400
c/w No. 19-30889

In arguing that he need not show similarity to prove infringement of his sound recordings, Batiste conflates probative similarity with substantial similarity. Probative similarity raises an inference of factual copying; substantial similarity "dictates whether the factual copying, once established, is legally actionable." *Positive Black Talk*, 394 F.3d at 370. *Bridgeport* dealt only with the substantial-similarity element. 410 F.3d at 798. Factual copying wasn't at issue there—the defendants admitted to sampling the plaintiff's recording. *Id.* at 796.

Unlike the plaintiff in *Bridgeport*, Batiste didn't get an admission from the defendants that they sampled his recordings. Nor did he present evidence to create a genuine dispute on that issue. *Cf. VMG Salsoul*, 824 F.3d at 877 (finding genuine dispute on factual copying when a witness testified that, in his presence, the defendant "directed an engineer to introduce sounds from [the plaintiff's recording] into [the defendants' recording]," and the plaintiff submitted reports from experts who concluded that the defendants sampled the plaintiff's recording). So even if we were to follow *Bridgeport*, Batiste's claims would still fail on the factual-copying element.

In sum, because Batiste didn't produce evidence for a reasonable jury to infer that the defendants had access to his music or to find striking similarities between his songs and those of the defendants, Batiste can't prove factual copying. Without proof that the defendants copied his works, Batiste's copyright claims fail. Thus, the district court correctly granted summary judgment for the defendants.

### III.

Now we turn to Batiste's second appeal, which challenges the district court's judgment awarding attorneys' fees and costs to the defendants. The defendants moved for fees and costs under the Copyright Act, 17 U.S.C. § 505, and asked the court to hold Batiste's attorney, DaShawn Hayes, jointly

and severally liable for the fee award as a sanction under 28 U.S.C. § 1927. The district court granted the motion and awarded the defendants $125,427.81 "to be paid by Plaintiff Paul Batiste and his counsel." Batiste contends that the district court erred not only in awarding fees to the defendants under the Copyright Act but also in holding his attorney jointly and severally liable for the fee award.

## A.

We first address the district court's award of fees under the Copyright Act. We review an award of attorneys' fees under the Copyright Act for abuse of discretion. *Hunn v. Dan Wilson Homes, Inc.*, 789 F.3d 573, 588 (5th Cir. 2015). Whether the district court applied an incorrect legal standard in awarding fees is a question of law reviewed de novo. *Compaq Comput. Corp. v. Ergonome Inc.*, 387 F.3d 403, 411 (5th Cir. 2004).

Under § 505 of the Copyright Act, a district court may award reasonable attorneys' fees and costs to the prevailing party. *See* 17 U.S.C. § 505. That statute "'clearly connotes discretion' and eschews any 'precise rule or formula' for awarding fees." *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979, 1985 (2016) (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533–34 (1994)). In exercising this discretion, courts must make a "particularized, case-by-case assessment" and "may not treat prevailing plaintiffs and prevailing defendants any differently." *Id.* The Supreme Court has listed "several nonexclusive factors" for courts to consider: "frivolousness, motivation, objective unreasonableness[,] and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* (alteration in original) (quoting *Fogerty*, 510 U.S. at 534 n.19).

In deciding whether to award fees, courts "should give substantial weight to the objective reasonableness of the losing party's position." *Id.* at 1983. But reasonableness is "only an important factor in assessing fee

16

applications—not the controlling one." *Id.* at 1988. Courts have discretion to award fees "even when the losing party advanced a reasonable claim or defense." *Id.* at 1983. For instance, a court may award fees "because of a party's litigation misconduct," regardless of "the reasonableness of his claims or defenses," or "to deter repeated instances of copyright infringement or overaggressive assertions of copyright claims, again even if the losing position was reasonable." *Id.* at 1988–89.

Batiste doesn't challenge the amount of fees awarded but rather the decision to award fees in the first place. He argues that the district court erred because it awarded fees without any evidence that his claims were "frivolous" or "brought in bad faith." In *Fogerty*, however, the Supreme Court rejected the practice of requiring a "showing of bad faith or frivolousness" before prevailing defendants could recover fees. 510 U.S. at 521 n.6, 533–34. So even if Batiste's suit wasn't frivolous or brought in bad faith, the district court still had discretion to award fees to the defendants.

We find no abuse of discretion here. The district court properly considered the objective unreasonableness of Batiste's claims as well as other relevant factors, such how Batiste litigated this action. Indeed, the magistrate judge's report, which the district court adopted, detailed many instances of litigation misconduct, including Batiste's submission of a ghost-written expert report, which the court considered fraudulent; his attempt to resubmit the excluded report in his own name; his practice of repeatedly amending his complaint to assert additional claims of infringement in response to the defendants' motions to dismiss; his many discovery abuses; and his disregard for the court's pretrial orders.

The district court also had discretion to award fees "to deter [Batiste's] overaggressive assertions of copyright claims." *Kirtsaeng*, 136 S. Ct. at 1989. Batiste has filed at least five other copyright actions. And not long

No. 19-30400
c/w No. 19-30889

before he filed this one, he pressed forward with similarly weak claims, which prompted a warning from the district court. In *Batiste v. Najm*, 28 F. Supp. 3d 595 (E.D. La. 2014), Batiste sued dozens of defendants, claiming that sixty-three of their songs infringed forty-five of his. *Id.* at 597–98. Just as he did here, Batiste relied on an expert report signed by Milton,[3] which addressed allegations of sampling. *Id.* at 625. The court cautioned Batiste that there was "serious concern of a good faith factual basis" for his sampling claims. *Id.* at 625–26. But Batiste ignored that warning. *See Batiste v. Najm*, No. 13-5463, 2015 WL 12559872, at *2 (E.D. La. Apr. 23, 2015). In the end, the district court dismissed all but three claims. *Najm*, 28 F. Supp. 3d at 626. In doing so, the court chided Batiste for "loading his complaint with over a hundred claims that had no realistic chance of success." *Id.*

Undeterred by the ruling in *Najm*, Batiste took aim at new targets, Macklemore and Lewis. But it's the same old song: his claims had no realistic chance of success. Given the objective unreasonableness of Batiste's claims, his history of litigation misconduct, and his pattern of filing overaggressive copyright actions, the district court didn't abuse its discretion in awarding fees to the defendants under the Copyright Act.

## B.

Finally, Batiste challenges the district court's decision to hold his attorney, Hayes, jointly and severally liable for the fee award as a sanction. Batiste argues that the court didn't make the findings required for imposing sanctions against Hayes under 28 U.S.C. § 1927. That may be true, but we lack jurisdiction to review this issue because Hayes didn't appeal.

---

[3] Milton's report in *Najm* is very similar to the ghost-written report that the district court excluded. In fact, Milton purportedly prepared his report in *Najm* using the same computer software programs that he admitted not having access to here.

No. 19-30400
c/w No. 19-30889

Under Rule 3 of the Federal Rules of Appellate Procedure, a notice of appeal must "specify the party or parties taking the appeal by naming each one in the caption or body of the notice." FED. R. APP. P. 3(c)(1)(A). This requirement is jurisdictional. *McCardell v. U.S. Dep't of Hous. & Urb. Dev.*, 794 F.3d 510, 515 (5th Cir. 2015). We liberally construe Rule 3, however, and won't dismiss an appeal for "failure to name a party whose intent to appeal is otherwise clear from the notice." *Kinsley v. Lakeview Reg'l Med. Ctr. LLC*, 570 F.3d 586, 589 (5th Cir. 2009) (quoting FED. R. APP. P. 3(c)(4)).

The question, then, is whether the unnamed party's intent to appeal is "objectively clear" from the notice. FED. R. APP. P. 3(c) advisory committee's note to 1993 amendment. For example, in *Garcia v. Wash*, 20 F.3d 608 (5th Cir. 1994) (per curiam), an attorney's intent to appeal was clear from the notice because the judgment at issue ordered sanctions solely against the attorney. *Id.* at 610. For that reason, there was no confusion as to whether the attorney, his client, or both were appealing. *Id.*

But the same is not true for a judgment that orders both an attorney and his client to pay fees. In *Payne v. University of Southern Mississippi*, 681 F. App'x 384 (5th Cir. 2017) (unpublished),[4] we lacked jurisdiction to review a judgment ordering an attorney to pay fees under 28 U.S.C. § 1927 because the attorney wasn't named in the notice and the orders being appealed

---

[4] Although not binding, *Payne* is "highly persuasive" because it addressed the same situation that we confront here. *United States v. Pino Gonzalez*, 636 F.3d 157, 160 (5th Cir. 2011). *Payne* is also consistent with many other circuits that have considered this issue. *See, e.g.*, *King v. Burr*, 757 F. App'x 178, 180 (3d Cir. 2018) (unpublished) (lacking jurisdiction to consider sanctions against attorney because notice of appeal didn't name attorney as party or otherwise reveal attorney's intent to appeal); *Reed v. Great Lakes Cos.*, 330 F.3d 931, 933 (7th Cir. 2003) (same); *Bogle v. Orange Cnty. Bd. of Cnty. Comm'rs*, 162 F.3d 653, 660–61 (11th Cir. 1998) (same); *Maerki v. Wilson*, 128 F.3d 1005, 1006–08 (6th Cir. 1997) (same); *Agee v. Paramount Commc'ns, Inc.*, 114 F.3d 395, 399–400 (2d Cir. 1997) (same). Thus, the clear weight of authority shows that *Payne* is correct.

awarded fees against both the attorney and his client. *Id.* at 387. As a result, there was no sign that the attorney was also appealing those orders rather than merely representing his client. *Id.*

The notice of appeal here is fatally deficient. It lists only Batiste as the party appealing; it doesn't mention Hayes in the caption or body. And just as in *Payne*, Hayes's intent to appeal isn't clear from the notice because the judgment being appealed ordered both Hayes and Batiste to pay fees. Nothing in the notice suggests that Hayes intended to take part as an appellant rather than as Batiste's attorney. As a result, we lack jurisdiction to review the sanction against Hayes.

Because we lack jurisdiction over that issue, reciting the instances of Hayes's misconduct wouldn't serve much purpose. Still, we're troubled that, in addition to his other lapses, Hayes signed and filed a summary-judgment opposition that relied on a report he either knew or, had he conducted a reasonable inquiry, likely should have known was prepared entirely by Batiste rather than the expert who signed it. Even after the expert admitted that Batiste did all the work and that he didn't have access to the necessary software, Hayes still insisted that the expert prepared the report. Providing vigorous representation is one thing; making false or misleading statements to a court is another. While we express no opinion as to whether Hayes's behavior was sanctionable, we take this opportunity to remind Hayes of his ethical and professional obligations as a lawyer and advise him to take those obligations seriously. We certainly do.

IV.

In conclusion, we lack jurisdiction to review the fee award against Hayes, but the district court's judgments are otherwise AFFIRMED.